(5)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>    v.<br><br>STATE OF DELAWARE,<br><br>  Defendant. | )<br>)<br>)<br>)<br>) CIVIL ACTION NO: 1 1 - 5 9 1<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

2011 JUL -6 AM 8: 56
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE
FILED

## SETTLEMENT AGREEMENT

I.   **Introduction**

  A. The State of Delaware ("the State") and the United States (together, "the Parties") are committed to full compliance with Title II of the Americans with Disabilities Act ("the ADA"), 42 U.S.C. § 12101 and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. This agreement is intended to ensure the State's compliance with the ADA, the Rehabilitation Act, and implementing regulations at 28 C.F.R. Part 35, and 45 C.F.R. Part 84 ("Section 504"), which require, among other provisions, that, to the extent the State offers services to individuals with disabilities, such services shall be provided in the most integrated setting appropriate to meet their needs. Accordingly, throughout this document, the Parties intend that the principles of self-determination and choice are honored and that the goals of community integration, appropriate planning, and services to support individuals at risk of institutionalization are achieved.

  B. The United States Department of Justice ("United States") initiated an investigation of Delaware Psychiatric Center ("DPC"), the State's psychiatric hospital, in November 2007 and completed on-site inspections of the facility and community services in May 2008 and August 2010. Following the completion of its investigation, the United States issued a findings letter notifying the State of its conclusions on November 9, 2010.

  C. The State engaged with the United States in open dialogue about the allegations and worked with the United States to resolve the alleged violations of federal statutory rights arising out of the State's operation of DPC and provision of community services for individuals with mental illness.

D. In order to resolve all issues pending between the Parties without the expense, risks, delays, and uncertainties of litigation, the United States and the State agree to the terms of this Settlement Agreement as stated below.  This agreement resolves the United States' investigation of DPC, as well as its ADA investigation.

E. By entering into this Settlement Agreement, Delaware does not admit to the truth or validity of any claim made against it by the United States.

F. The Parties acknowledge that the Court has jurisdiction over this case and authority to enter this Settlement Agreement and to enforce its terms as set forth herein.

G. No person or entity is intended to be a third-party beneficiary of the provisions of this Settlement Agreement for purposes of any other civil, criminal, or administrative action, and accordingly, no person or entity may assert any claim or right as a beneficiary or protected class under this Settlement Agreement in any separate action.  This Settlement Agreement is not intended to impair or expand the right of any person or organization to seek relief against the State or their officials, employees, or agents.

H. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331; 28 U.S.C. § 1345; and 42 U.S.C. §§ 12131-12132.  Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

## II.   Substantive Provisions

A. In order to comply with this agreement, the State must prevent unnecessary institutionalization by offering the community-based services described in this Section (II) to individuals in the target population.  The services must be developed and provided according to the implementation timeline described in Section III.  The services may be provided directly by the State or through a contract managed by the State.

### B. Target Population

1. The target population for the community services described in this section is the subset of the individuals who have serious and persistent mental illness (SPMI) who are at the highest risk of unnecessary institutionalization.  SPMI is a diagnosable mental, behavioral, or emotional disorder of sufficient duration to meet diagnostic criteria and has been manifest in the last year, has resulted in functional impairment which substantially interferes with or limits one or more major life activities, and has episodic, recurrent, or persistent features.

2

2. Priority for receipt of services will be given to the following individuals within the target population due to their high risk of unnecessary institutionalization:

   a. People who are currently at Delaware Psychiatric Center, including those on forensic status for whom the relevant court approves community placement;

   b. People who have been discharged from Delaware Psychiatric Center within the last two years and who meet any of the criteria below;

   c. People who are, or have been, admitted to private institutions for mental disease ("IMDs") in the last two years;

   d. People with SPMI who have had an emergency room visit in the last year, due to mental illness or substance abuse;

   e. People with SPMI who have been arrested, incarcerated, or had other encounters with the criminal justice system in the last year due to conduct related to their serious mental illness; or

   f. People with SPMI who have been homeless for one full year or have had four or more episodes of homelessness in the last three years;

3. People in the State who have SPMI may request services described in Section II of this agreement or may be referred for such services by a provider, family member, advocate, or State agency staff. Once the State receives a request or referral, the person with SPMI will be placed on the State's Target Population List.

4. Priority for receipt of services among those on the Target Population List will go to people who meet one of the criteria listed in II.B.2.a-f.

## C. Crisis Services

1. The State shall develop a statewide crisis system. The crisis system shall:

   a. Provide timely and accessible support to individuals with mental illness experiencing a behavioral health crisis, including a crisis due to substance abuse;

   b. Stabilize individuals as quickly as possible and assist them in returning to their pre-crisis level of functioning;

3

    c.  Provide solution-focused and recovery-consistent interventions that are intended to be diversionary in nature and avoid unnecessary hospitalizations, incarceration, or placement in a crisis stabilization program;

    d.  Serve as an entry point to the mental health system. This shall include developing and implementing a pre-screening function that includes appropriate diversions and ensures that the State has a central role in determining whether an individual is involuntarily admitted to a psychiatric hospital (DPC or IMDs); and

    e.  Assess the individual's needs, identify the supports and services that are necessary to meet those needs, and connect the individual to those services.

**2.  Crisis System Components**

    **a.  Crisis Hotline**

        i.    The crisis hotline is a toll-free statewide telephone system that people can use to access information about and referrals to local resources.

        ii.   The crisis hotline will be staffed 24 hours per day, 7 days per week with licensed clinical professionals who are able to assess the crisis by phone and assist the caller in identifying and connecting with local services. Where necessary, the crisis hotline will dispatch a mobile crisis team.

    **b.  Mobile Crisis Teams**

        i.    Mobile crisis teams respond to people at their homes and in other community settings and offer services, support and treatment to de-escalate the crisis without removing the individual from the community. Crisis teams include clinicians trained to provide emergency services, clinicians trained to provide substance abuse services and peer specialists.

        ii.   Mobile crisis teams work with trained law enforcement personnel to respond to people in mental health crisis who come into contact with law enforcement.

        iii.  Mobile crisis teams are available 24 hours per day, 7 days per week and respond to crises within one hour.

c.   **Crisis Walk-In Centers**

  i.   Crisis walk-in centers provide community-based psychiatric and counseling services to people experiencing a mental health crisis. Staff assess, treat, and refer individuals experiencing a crisis without removing them from their homes and community.

  ii.   Where an individual who comes into contact with law enforcement personnel is in need of mental health services, law enforcement officers can refer or bring individuals to the local crisis walk-in center.

  iii.   The walk-in centers will be staffed 24 hours per day, 7 days per week with licensed clinical professionals.

d.   **Crisis Stabilization Services**

  i.   Crisis stabilization services are short-term acute inpatient care intended to stabilize an individual and avoid long-term psychiatric hospitalization. Lengths of stay shall be limited to no longer than 14 days.

  ii.   Prior to admitting an individual for crisis stabilization services, the State shall, to the extent permitted by law, determine that such services are required and that admission of the individual could not be avoided through the use of other services.

  iii.   When an individual is admitted for acute care, intensive support service providers will engage with the individual within 24 hours of admission in order to facilitate a quick return to the community with necessary supports.

  iv.   The discharge of any individual receiving state-funded crisis stabilization services will be completed in accordance with the requirements in Section IV.

e.   **Crisis Apartments**

  i.   Crisis apartments are apartments where individuals experiencing a psychiatric crisis can stay for up to seven days to receive support and stabilization services in the community before returning home. These apartments serve as an alternative to hospitalization and the clinical and peer

5

staff assists individuals in de-escalating crises without leaving the community.

    ii.   Each crisis apartment will have peer staff on-site 24 hours per day, 7 days per week and will have licensed clinical staff on-call 24 hours per day, 7 days per week.

**D. Intensive Support Services**

1. The State shall develop a continuum of support services intended to meet the varying needs of individuals with mental illness. The support system shall:

    a.  Be flexible and individualized to meet the needs of the individual;

    b.  Promote successful community living, including the retention of housing;

    c.  Help individuals to increase individuals' abilities to recognize and deal with situations that may otherwise result in crises; and

    d.  Increase and improve individuals' networks of community and natural supports, as well as their use of these supports for crisis prevention.

**2. Support System Components**

**a. Assertive Community Treatment (ACT)**

    i.   ACT teams deliver comprehensive, individualized, and flexible support, services, and rehabilitation to individuals in their homes and communities. An ACT team is a multidisciplinary group of professionals including a psychiatrist, a nurse, a psychologist, a social worker, a substance abuse specialist, a vocational rehabilitation specialist and a peer specialist. Services are customized to an individual's needs and vary over time as needs change. Among the services that may be offered to a client at a given time are: case management, initial and ongoing assessments, psychiatric services, assistance with employment and housing, family support and education, substance abuse services, crisis services, and other services and supports critical to allow the individual to live independently in the community.

6

    ii.    ACT Team services are available 24 hours per day, 7 days per week.

    iii.    Each ACT team, comprised of between 7-10 members, will serve no more than 10 people per ACT team member.

    iv.    ACT teams will operate with fidelity to the Dartmouth Assertive Community Treatment model.

**b. Intensive Case Management (ICM)**

    i.    Intensive Case Management teams provide coordination of treatment and support services. The teams are supervised by licensed, master's level clinical mental health professionals who supervise case managers and offer direct support to individuals as needed. Case managers work with individuals to help them identify and access community supports and services, including needed medical, social, educational, housing, and other services.

    ii.    ICM teams will serve no more than 20 people per team member and each supervisor will manage no more than 10 case managers.

**c. Case Management (CM)**

    i.    Case Management providers coordinate treatment and support services. Case managers work with individuals to help them identify and access community supports and services, including needed medical, social, educational, housing and other services.

    ii.    Case managers will each serve no more than 35 individuals and each supervisor will manage no more than 15 case managers.

**E. Housing**

1. The State will support individuals in the target population living in their own homes. The housing services will:

    a.    Ensure that people with SPMI can live like the rest of Delawareans, in their own homes, including leased apartments, houses, or living with their family;

    b.    Offer people choice regarding where they live and with whom;

c.  Provide an array of supportive services that vary according to people's changing needs and promote housing stability.

**2. Supported Housing**

a.  Supported housing is permanent housing with tenancy rights and support services that enables people to attain and maintain integrated affordable housing. Support services offered to people living in supported housing are flexible and are available as needed and desired, but are not mandated as a condition of obtaining tenancy.

b.  The State will fund rental subsidies or vouchers to ensure that supported housing apartments are affordable to individuals with limited incomes, including those receiving SSI benefits. The State will also provide additional bridge funding to cover deposits and other household necessities that individuals require as they procure and set up a new apartment.

c.  Supported housing provided under this agreement may be in the form of assistance from the Division of Substance Abuse and Mental Health, the Delaware State Housing Authority, the federal Department of Housing and Urban Development, and from any other governmental or private source. Nothing in this agreement shall require the State to forgo federal funding or federal programs to provide housing for individuals in the target population. To count as supported housing for purposes of meeting the State's obligations under Part III.I., however, all new housing created under this agreement must satisfy the requirements of Part II.E.

d.  All new housing created under this agreement will be scattered site supported housing, with no more than 20% of the units in any building to be occupied by individuals with a disability known to the State.

e.  All new housing created under this agreement will have no more than two people in a given apartment, with a private bedroom for each person. If two people are living together in an apartment, the individuals must be able to select their own roommates.

f.  Supported housing providers cannot reject individuals for placement due to medical needs or substance abuse history.

**F. Supported Employment and Rehabilitation Services**

1. The State shall develop options for people to work or access education and rehabilitation services. The supported employment and rehabilitation services shall:

   a. Offer integrated opportunities for people to earn a living or to develop academic or functional skills; and

   b. Provide individuals with opportunities to make connections in the community.

2. Supported Employment and Rehabilitation Services Components

   **a. Supported Employment**

      i. Supported employment is a service through which individuals receive assistance in preparing for, identifying, attaining, and maintaining integrated, paid, competitive employment. Among the services that a provider may offer is job coaching, transportation, assistive technology, specialized job training, and individually tailored supervision.

      ii. Supportive employment providers will adhere to an evidence-based model for supporting people in their pursuit of and maintenance of work opportunities.

   **b. Rehabilitation Services**

      i. Rehabilitation services include education, substance abuse treatment, volunteer work, and recreational activities, and other opportunities to develop and enhance social, functional and academic skills in integrated settings. With respect to the State's application for Medicaid funding for such services, the definition at 42 *CFR* 440.130 shall take precedence over the definition listed herein and the explanation of Rehabilitation Services herein is for the purposes of enforcement of this Settlement Agreement only.

9

### G. Family and Peer Supports

#### 1. Family Supports

a. Family supports are designed to teach families skills and strategies for better supporting their family members' treatment and recovery in the community. Supports include training on identifying a crisis and connecting people in crisis to services, as well as education about mental illness and about available ongoing community-based services.

b. Family supports can be provided in individual and group settings.

#### 2. Peer Supports

a. Peer supports are services delivered by trained individuals who have personal experience with mental illness and recovery to help people develop skills in managing and coping with symptoms of illness, self-advocacy, identifying and using natural supports.

b. Peer supports can be provided in individual and group settings, in person or by phone.

H. The State shall ensure that providers of services listed in this Section (II) have linguistic and cultural competence to serve all individuals in the target population.

### III. Implementation Timeline

### A. Crisis Hotline

1. By January 1, 2012 the State will develop and make available a crisis line for use 24 hours per day, 7 days per week.

2. By July 1, 2012 the State will provide publicity materials and training about the crisis hotline services in every hospital, police department, homeless shelter, and department of corrections facility in the State. The training will be developed in consultation with the Monitor.

### B. Mobile Crisis Services

1. By July 1, 2012 the State will make operational a sufficient number of mobile crisis teams such that a team responds to a person in crisis anywhere in the state within one hour.

2. By July 1, 2013 the State will train all state and local law enforcement personnel about the availability and purpose of the mobile crisis teams and on the protocol for calling on the team.

## C. Crisis Walk-in Centers

1. In addition to the crisis walk-in center in New Castle County serving the northern region of the State, by July 1, 2012, the State will make best efforts to make operational one crisis walk-in center in Ellendale to serve the southern region of the State. The crisis center in Ellendale shall be operational no later than September 1, 2012.

2. By July 1, 2013 the State will train all state and local law enforcement personnel about the availability and purpose of the crisis walk-in centers and on the protocol for referring and transferring individuals to walk-in centers.

## D. Crisis Stabilization Services

1. By July 1, 2012 the State will ensure that an intensive services provider meets with every individual receiving acute inpatient crisis stabilization services within 24 hours of admission in order to facilitate return to the community with the necessary supports and that all transition planning is completed in accordance with Section IV.

2. By July 1, 2013 the State will train all provider staff and law enforcement personnel to bring people experiencing mental health crises to crisis walk-in centers for assessment, rather than to local emergency rooms or IMDs.

3. By July 1, 2014 the number of annual State-funded patient days in acute inpatient settings in the State will be reduced by 30% from the State's baseline on the Effective Date of the Settlement Agreement as determined by the Monitor and the Parties.

4. By July 1, 2016 the number of annual State-funded patient days in acute inpatient settings in the State will be reduced by 50% from the State's baseline on the Effective Date of the Settlement Agreement as determined by the Monitor and the Parties.

### E. Crisis Apartments

1. By July 1, 2012 the State will make operational two crisis apartments.

2. By July 1, 2013 the State will make operational a minimum of two additional crisis apartments, ensuring that the four apartments total are spread throughout the State.

### F. Assertive Community Treatment

1. By July 1, 2012 the State will expand its 8 ACT teams to bring them into fidelity with the Dartmouth model.

2. By September 1, 2013 the State will add 1 additional ACT teams that are in fidelity with the Dartmouth model.

3. By September 1, 2014 the State will add 1 additional ACT team that is in fidelity with the Dartmouth model.

4. By September 1, 2015 the State will add 1 additional ACT team that is in fidelity with the Dartmouth model.

### G. Intensive Case Management

1. By July 1, 2012 the State will develop and begin to utilize 3 ICM teams.

2. By January 1, 2013 the State will develop and begin to utilize 1 additional ICM team.

### H. Case Management

1. By July 1, 2012 the State will train and begin to utilize 15 case managers.

2. By September 1, 2013 the State will train and begin to utilize 3 additional case managers.

3. By September 1, 2014 the State will train and begin to utilize 3 additional case managers.

4. By September 1, 2015 the State will train and begin to utilize 4 additional case managers.

**I.  Supported Housing**

1.  By July 11, 2011, the State will provide housing vouchers or subsidies and bridge funding to 150 individuals.  Pursuant to Part II.E.2.d., this housing shall be exempt from the scattered-site requirement.

2.  By July 1, 2012 the State will provide housing vouchers or subsidies and bridge funding to a total of 250 individuals.

3.  By July 1, 2013 the State will provide housing vouchers or subsidies and bridge funding to a total of 450 individuals.

4.  By July 1, 2014 the State will provide housing vouchers or subsidies and bridge funding to a total of 550 individuals.

5.  By July 1, 2015 the State will provide housing vouchers or subsidies and bridge funding to a total of 650 individuals.

6.  By July 1, 2016 the State will provide housing vouchers or subsidies and bridge funding to anyone in the target population who needs such support. For purposes of this provision, the determination of the number of vouchers or subsidies and bridge funding to be provided shall be based on: the number of individuals in the target population who are on the State's waiting list for supported housing; the number of homeless individuals who have a serious persistent mental illness as determined by the 2016 Delaware Homeless Planning Council Point in Time count; and the number of individuals at DPC or IMDs for whom the lack of a stable living situation is a barrier to discharge.  In making this determination, there should be due consideration given to (1) whether such community-based services are appropriate, (2) the individuals being provided such services do not oppose community-based treatment, and (3) the resources available to the State and the needs of other persons with disabilities. Olmstead v. L.C., 527 U.S. 581 at 607 (1999).

**J.  Supported Employment**

1.  By July 1, 2012 the State will provide supported employment to 100 individuals per year.

2.  By July 1, 2013 the State will provide supported employment to 300 additional individuals per year.

3.  By July 1, 2014 the State will provide supported employment to an additional 300 individuals per year.

13

    4. By July 1, 2015 the State will provide supported employment to an
    additional 400 individuals per year.

    5. In addition, by January 1, 2012 all individuals receiving ACT services
    will receive support from employment specialists on their ACT teams.

## K. Rehabilitation Services

1. By July 1, 2012 the State will provide rehabilitation services to 100
individuals per year.

2. By July 1, 2013 the State will provide rehabilitation services to 500
additional individuals per year.

3. By July 1, 2014 the State will provide rehabilitation services to an
additional 500 individuals per year.

## L. Family and Peer Supports

1. By July 1, 2012 the State will provide family or peer supports to 250
individuals per year.

2. By July 1, 2013 the State will provide family or peer supports to 250
additional individuals per year.

3. By July 1, 2014 the State will provide family or peer supports to an
additional 250 individuals per year.

4. By July 1, 2015 the State will provide family or peer supports to an
additional 250 individuals per year.

## IV. Transition Planning

## A. Assessment and Placement of People Currently in Institutional Settings

1. Each individual, now in or being admitted to DPC or an IMD, shall have
a transition team including clinical staff and a representative of a
community-based mental health provider.

    a. Discharge planning shall begin upon admission.

    b. Discharge assessments shall begin with the presumption that with
    sufficient supports and services, individuals can live in an
    integrated community setting.

14

    c.  Discharge planning shall be developed and implemented through a person-centered planning process, in which the individual has a primary role, and based on principles of self-determination. Discharge planning teams shall have the linguistic and cultural competence to serve all individuals. The goal of discharge planning is to assist the individual in developing a plan to achieve outcomes that promote the individual's growth, well being, and independence, based on the individual's strengths, needs, goals, and preferences, in the most integrated settings in all domains of the individual's life (including community living, activities, employment, education, recreation, healthcare, and relationships).

    d.  The team will meet within five days of admission to identify needed services and supports that would allow the individual to return to the community, regardless of whether currently available.

    e.  The community provider must meet with the individual before the initial team meeting and then at least once every month while services are being planned and developed.

    f.  The team should engage a peer specialist who has utilized supports similar to those recommended for the individual to help prepare the individual for the transition to the community.

2. A re-assessment will commence for all individuals currently in DPC or an IMD within 30 days after this agreement is signed.

3. In the event that a treatment team makes a recommendation to maintain the institutional care or to place an individual in a less integrated setting (e.g., congregate care, nursing home), the treatment team shall identify the barriers to placement in a more integrated setting, describe steps the team will take to address the barriers, and begin engaging the specialized transition team.

4. The State will create a central specialized transition team to assist treatment teams in addressing identified barriers to discharge for individuals whose teams recommend remaining in DPC or an IMD or recommend discharge to a less integrated setting (i.e., congregate care, nursing home) for whom the teams cannot agree on a plan, and for individuals who have intensive behavioral or medical needs.

5. Where the specialized team is unable to identify an appropriate community placement, the case will be referred to the Monitor for review.

6. Individuals who remain in DPC or an IMD after the assessment process will be assessed for transition to more integrated settings at least once every month and more frequently upon request or when there is a change in condition.

7. For individuals on forensic status for whom the treatment team or specialized team recommends community placement, the State shall educate judges about the recommended placement and services and participate where appropriate in judicial proceedings on behalf of those individuals.

## B. Implementation of Transition Assessments and Placement

1. Within 30 days of the signing of the agreement the State will re-assess all individuals currently in institutional settings.

2. Within 60 days of the signing of the agreement the State will make operational transition teams including community provider and peer representatives.

3. Within 60 days of the signing of the agreement the State will make operational a central specialized transition team including community provider and peer representatives.

4. The State shall have as its goal that where a transition team determines that a community placement is the most integrated setting appropriate for an individual currently in DPC or an IMD, that individual will be discharged to the community with necessary supports within 30 days. Between July 1, 2014 and July 1, 2015, the State shall meet this goal for at least 75% of people transitioning from DPC or an IMD. Between July 1, 2015 and July 1, 2016, the State shall meet this goal for at least 95% of people transitioning from DPC or an IMD.

5. By July 1, 2012, the State shall develop a program to educate judges and law enforcement about community supports and services for individuals with mental illness on forensic status.

## V. Quality Assurance and Performance Improvement

A. The goal of the State's Quality Assurance and Performance Improvement System shall be to ensure that all mental health services funded by the State are of good quality and are sufficient to help individuals achieve positive outcomes, including increased integration and independence, and self-determination in all life domains (e.g., community living, employment, education, recreation, healthcare, and relationships); stable community living, avoidance of harms, and decreased hospitalization and institutionalization.

## B. Risk Management

1. The State will require that DPC, IMDs, and community providers develop transition and service plans that proactively identify and address risks of harm to individuals receiving services. Harm includes any physical or emotional injury, whether caused by abuse, neglect, or accidental causes.

2. When a risk of harm is identified, preventive measures will be developed and implemented.

3. All providers of services will be trained on common harm prevention measures. Staff working with individuals with identified risks must be competent to implement their plans, including the individualized preventive measures.

4. If harm occurs despite these measures, the responsible State, IMD or community provider will complete a root cause analysis within 10 days.

5. Using the results of the root cause analysis, the State, IMD or community provider will develop and implement a corrective action to prevent future harm.

6. The State, IMD or community provider will assess the effectiveness of all corrective actions. If the corrective action does not effectively address the identified harm, a specialized team from the State's Performance Improvement Section will be notified and will assist in developing and implementing a modified corrective action plan. The State specialists will remain involved in the case until the harm is effectively addressed.

7. Each identified harm and the responsive corrective action will be reported to the State's Performance Improvement Section.

8. If the State, IMD, or community provider refuses to report harms, implement corrective actions, or comply with the Performance Improvement Section specialists' recommendations, the State, in consultation with the Monitor, will take appropriate action.

9. The State will develop a detailed process for collecting and utilizing data on risk management at DPC, IMDs, and community providers incorporating the steps listed in V.B.1-8. The process is intended to identify patterns and trends in the quality of care and ensure a continuous loop of performance evaluation and improvement.

17

    10. The Monitor must review and approve the State's risk management process.

## C. Contracting

1. Contracts with community service providers will specifically describe expectations for services provided as well as for outcomes to be achieved.

2. Contracts with community service providers will be performance-based.

## D. Quality Service Reviews

1. The State will use Quality Service Reviews (QSRs) to evaluate the quality of services at an individual, provider and system-wide level. QSRs collect information through a sample of face-to-face interviews of the consumer, relevant professional staff, and other people involved in the consumer's life and through review of individual treatment plans. QSRs evaluate, among other things, whether individuals' needs are being identified, whether supports and services are meeting individuals' needs, and whether supports and services are designed around individuals' strengths and meeting individuals' goals.

2. The State shall design a process for implementing QSRs in conjunction with the Monitor, with input from the United States.

3. The State will conduct QSRs annually, with each community provider providing services under this agreement to be reviewed at least once every two years. Each new provider will be reviewed in the first year it offers services under this agreement.

4. The State will use data from the QSRs to identify strengths and areas for improvement at the individual, provider, and system-wide levels.

## E. Use of Data

1. The State shall collect and analyze data from assessments of the most integrated setting appropriate, including data about barriers to service, in order to refine Olmstead planning and determine whether additional specialized services are needed.

2. The State shall ensure that every community provider assesses the adequacy of the individualized supports and services provided to persons in the target population by collecting and analyzing data, including, but not limited to:

a.  Number of incidents of harm;

b.  Number of repeat admissions to DPC, an IMD, or other inpatient psychiatric facilities;

c.  Use of crisis beds and community hospital admissions;

d.  Repeat emergency room visits;

e.  Number of arrests and incarceration;

f.  Time spent in congregate day programming;

g.  Number of people employed, attending school, or engaged in community life;

h.  Acquisition of life skills; and

i.  Maintenance of a chosen living arrangement.

3.  Each year the State will aggregate and analyze the data collected by the State and by individual providers on the indicators listed in Section V.E. 1, 2.

4.  If data collected under this section shows that the agreement's intended outcomes of increased integration, stable housing, and decreased hospitalization and institutionalization are not occurring, the State will convene a team including the Monitor and representatives of the U.S. Department of Justice, to consider modifications to community services.

## F.  Reporting

1.  The State will publish an annual report identifying the number of people served in each type of service described in this agreement.

2.  The State will publish an annual report of unmet needs using data gathered during admissions assessments, discharge planning processes, and community provider reports.

3.  The State will publish an annual report on the quality of services provided by the State and community providers using data collected through the risk management system, the contracting process, the QSRs, and the outcome data.

## VI.  Monitor and Monitoring

### A.  Selection and Replacement of the Monitor

1.  The Parties agree that Robert Bernstein shall be the Monitor.

2.  In the event the Monitor resigns or the Parties agree to replace the Monitor, the Parties shall meet and confer within 30 days of the resignation or their agreement, select a replacement, and notify the Court.  If they are unable to agree on the replacement Monitor at the meet and confer, the United States and the State shall each, within 21 days of the meet and confer, nominate up to two individuals with expertise in the provision of community services to persons with mental illness.  The Court will select the Monitor from among those nominated.

### B.  Monitor Powers and Responsibilities

1.  The Monitor is an officer of the Court.  The Monitor will review and report on the State's compliance with the agreement.  The Parties will cooperate fully with the Monitor.  The Monitor will pursue a problem-solving approach so that disagreements can be amicably resolved when possible and the Parties' energies can be devoted to achieving compliance.

2.  The Monitor shall have the authority and responsibility to complete the following actions:

    a.  Independently observe and assess the State's compliance with the agreement.

    b.  At least twice a year draft and submit to the Parties and the Court a comprehensive public report on the State's compliance including recommendations, if any, to facilitate or sustain compliance.

    c.  Review the adequacy and quality of the individualized supports and services provided to persons (a) discharged from the State hospital or (b) at risk of institutionalization, including those living with families.

    d.  Review and make recommendations regarding transition plans where the individual's team and the specialized transition team have been unable to identify an appropriate community placement.

    e.  Notify the Parties if the Monitor determines that a life-threatening situation or other emergency exists.  This does not relieve the State of its obligation to report and notify the Monitor and the United

States of the death or serious physical injury of any individual in DPC or any individuals receiving services in the community pursuant to the Settlement Agreement as specified in Section VI.D.

f.   Independently determine that the specific scope, quantity, or implementation timeline relating to any demanded service be decreased or delayed when it appears that the State's resources might be better utilized to serve the target population.

g.   Mediate any dispute arising out of a Party's position regarding the construction or implementation of this agreement.

h.   Provide the State technical assistance relating to any aspect of this agreement or its stated purposes.

3.   In completing the responsibilities listed in VI.B.2. the Monitor may:

a.   Hire staff and consultants as necessary to assist in carrying out the Monitor's duties and responsibilities.

b.   Require written reports from the State concerning compliance.

c.   Enter, with or without advance notice, any part of DPC or any other facility or program providing services to persons covered by this agreement and may interview, on a confidential basis or otherwise, persons affected by the Settlement Agreement. Staff and consultants of the Monitor shall also have such authority.

d.   Access residents, persons, employees, residences, facilities, buildings, programs, services, documents, records, and materials as necessary to assess the State's compliance with and/or implementation of this Settlement Agreement.

e.   Communicate ex parte with the Court or with a Party as well as counsel, agents or staff of a Party or anyone else the Monitor deems necessary for completing his or her responsibilities. The monitor shall have the authority to convene meetings as appropriate.

f.   Testify in this case regarding any matter relating to the implementation, enforcement, or dissolution of the Settlement Agreement, including, but not limited to, the Monitor's observations, findings, and recommendations in this matter.

g.   Determine, using criteria set forth herein, whether the State is in substantial compliance, partial compliance, or non- compliance

21

with its obligations under this Settlement Agreement. The Monitor shall utilize the following criteria when assessing the State's level of compliance with each of the terms of the Settlement Agreement:

i.  Substantial Compliance. The term "substantial compliance" shall mean that the State has satisfied the requirements of all components of the assessed paragraph. This Settlement Agreement will terminate when the State has achieved substantial compliance with all paragraphs of the agreement and has maintained that substantial compliance for a period of one year. The USDOJ will determine whether the State has, in fact, maintained substantial compliance for the one-year period. Non-compliance with mere technicalities, or temporary failure to comply during a period of otherwise sustained compliance will not constitute failure to maintain substantial compliance. At the same time, temporary compliance during a period of sustained non-compliance shall not constitute substantial compliance.

ii.  Partial Compliance. The term "partial compliance" shall mean that the State has achieved less than substantial compliance with all of the components of a rated paragraph of the agreement, but has made some progress toward substantial compliance on most of the key components of the rated paragraph. A partial compliance rating encompasses a wide range of performance by the State. Specifically, a partial compliance rating can signify that that the State is nearly in substantial compliance, or it can mean that the State is only slightly above a non-compliance rating.

iii.  Noncompliance. The term "non-compliance" shall mean that the State has made negligible or no progress toward compliance with all of the components of the Settlement Agreement paragraphs being assessed.

C. **Limits on Monitor Liability and Discovery**

1. Neither the Monitor nor any staff or consultants retained by the Monitor, shall be:

   a. Liable for any claim, lawsuit, or demand arising out of their activities under this agreement. This paragraph does not apply to any proceeding for payment under contracts into which they have entered in connection with their work under the Settlement

Agreement; any such proceeding shall take place solely before this Court.

b. Subject to formal discovery, including, but not limited to, deposition(s), request(s) for documents, request(s) for admissions, interrogatories, or other disclosures  In contested litigation, the Parties are not entitled to access the records or communications of the Monitor or any staff or consultants (person or entity) retained by the Monitor. However, the Monitor may provide copies of records or communications at the Monitor's discretion but must disclose to all parties those shared materials. The Court may review the Monitor's records at the Court's discretion.

D. The State promptly shall notify the Monitor and the United States of the death or serious physical injury of any individual in DPC. The State shall notify the Monitor and the United States of the death or serious physical injury of any individuals receiving services in the community pursuant to the Settlement Agreement when such information is known to the State. The State shall, via email, forward to the United States and the Monitor, electronic copies of all completed incident reports and final reports of investigations related to such incidents as well as autopsies and death summaries when such information is known to the State. The submission of any such incident reports, investigative reports, autopsies and death summaries is not intended, and shall not be construed, as a waiver, in litigation with third parties, of any applicable statutory or common law privilege associated with such information. Other than to carry out the express functions as set forth herein, both the United States and the Monitor shall hold such information in strict confidence to the greatest extent permitted by any applicable law or regulation.

E. The State shall collect data with respect to each element of required performance under the terms of the Settlement Agreement and make it available on a timely basis to the Monitor. The submission of any such data element is not intended, and shall not be construed, as a waiver, in litigation with third parties, of any applicable statutory or common law privilege associated with such information. Other than to carry out the express functions as set forth herein, both the United States and the Monitor shall hold such information in strict confidence to the greatest extent permitted by any applicable law or regulation.

**F. Budget of the Monitor**

1. Within 45 days of his/her appointment, the Monitor shall submit to the Court for the Court's approval a proposed budget for the first twelve months of operations.

2. The Monitor will provide the Parties a draft of the proposed budget at least fifteen days in advance of its submission to the Court.  The Parties

shall raise with the Monitor any objections they may have to the draft of the proposed budget within ten days of its receipt. If the objection is not resolved before the Monitor's submission of a proposed budget to the Court, a Party may file the objection with the Court within ten days of the submission of the proposed budget to the Court. The Court will consider such objections and make any adjustments the Court deems appropriate prior to approving the budget.

3. Thereafter, the Monitor shall submit annually a proposed budget for the Court's approval in accordance with the process set forth above.

4. At any time, the Monitor may submit to the Court for approval a proposed revision to the approved budget, along with any explanation of the reason for the proposed revision. Budget revisions will be effective upon approval by the Court.

## G. Reimbursement and Payment Provisions

1. The cost of the Monitor, including the cost of any staff or consultants to the Monitor, shall be borne by the State in this action, but the Monitor and the Monitor's staff or consultants are not agents of the State. All reasonable expenses incurred by the Monitor or any of the Monitor's staff in the course of the performance of the duties of the Monitor, shall be reimbursed by the State. The Court retains the authority to resolve any dispute that may arise regarding the reasonableness of fees and costs charged by the Monitor.

2. The State shall deposit $100,000.00 into the Registry of the Court as interim payment of costs incurred by the Monitor. This deposit and all other deposits pursuant to this Order shall be held in the Court Registry Investment System and shall be subject to the standard registry fee imposed on depositors.

3. The Monitor shall submit monthly statements to the Court, with copies to the Parties, detailing all expenses the Monitor incurred during the prior month. The Court shall order the clerk to make payments to the Monitor. The clerk shall make those payments within 10 days of the entry of the Order directing payment. Within 45 days of the entry of each Order directing payment, the State shall replenish the fund with the full amount paid by the clerk in order to restore the fund's total to $100,000.00.

4. The Monitor shall not enter into any contract with the State while serving as the Monitor. If the Monitor resigns from his or her position as Monitor, the former Monitor may not enter any contract with the State on a matter related to this Settlement Agreement without the written

consent of the United States while this Settlement Agreement remains in effect.

## VII.   Construction and Termination

A. The Parties agree jointly to file this agreement with the United States District Court for the District of Delaware. The joint motion shall request that the Court enter the Settlement Agreement as an order of the Court.

1. The Parties anticipate that the State will have substantially complied with all provisions of the Settlement Agreement by July 1, 2016. Substantial compliance is achieved where the State has implemented all of the provisions of the agreement. Any violations of the agreement that are minor or occasional and are not systemic shall not be deemed non-compliance.

2. The Court shall retain jurisdiction of this action for all purposes until the State has substantially complied with all provisions of this Settlement Agreement and maintained substantial compliance with all provisions for one year. The Parties may agree to ask the Court to terminate the Settlement Agreement before the end of the anticipated five-year term, provided the State has substantially complied with all provisions of the Settlement Agreement and maintained substantial compliance with all provisions for one year. If the case has not yet been dismissed, the Parties agree to ask the Court for a non-evidentiary hearing on the status of compliance on or near July 1, 2016. If the Parties agree that there is non-compliance, or if there is a dispute about compliance, the Parties will so inform the Court, and the Court may set additional hearing dates as appropriate. If the State asserts that it is in compliance and the United States disputes the claim, the State shall bear the burden of demonstrating that it is in substantial compliance. The Parties may agree jointly at any time to allow for additional time to resolve compliance issues.

B. This Settlement Agreement may terminate prior to July 1, 2016 if the United States certifies that the State has substantially complied with each of the provisions of the agreement and has maintained substantial compliance for at least one year. The burden shall be on the State to demonstrate this level of compliance.

C. With the exception of conditions or practices that pose an immediate and serious threat to the life, health, or safety of individuals covered by this agreement, if the United States believes that the State has failed to fulfill any obligation under this Settlement Agreement, the United States shall, prior to initiating any court proceeding to remedy such failure, give written notice to the State which, with specificity, sets forth the details of the alleged noncompliance.

1. With the exception of conditions or practices that pose an immediate and serious threat to the life, health, or safety of individuals covered by this agreement, the State shall have forty-five (45) days from the date of such written notice to respond to the United States in writing by denying that substantial noncompliance has occurred, or by accepting (without necessarily admitting) the allegation of noncompliance and proposing steps that the State will take, and by when, to cure the alleged noncompliance.

2. If the State fails to respond within 45 days or denies that substantial noncompliance has occurred, the United States may seek an appropriate judicial remedy.

D. If the State timely responds by proposing curative action by a specified deadline, the United States may accept the State's proposal or offer a counterproposal for a different curative action or deadline, but in no event shall the United States seek an appropriate judicial remedy for the alleged noncompliance until at least 30 days after the State has responded under VII.C.2. above and until the Parties have conferred in good faith to resolve any outstanding differences.

1. The Parties may extend by mutual agreement the time period specified in this paragraph. If the Parties reach an agreement that varies from the provisions of this Settlement Agreement, the new agreement shall be reduced to writing, signed, and filed with the Court for approval.

2. If the Parties fail to reach agreement on a plan for curative action, the United States may seek an appropriate judicial remedy.

E. If the United States believes that conditions or practices pose an immediate and serious threat to the life, health, or safety of individuals in DPC or receiving the community services required under this agreement, the United States may, without further notice, initiate a court proceeding to remedy those conditions or practices.

F. The Parties agree to work collaboratively to achieve the ultimate goal of achieving full compliance with the requirements of the law relating to the provision of adequate mental health services to the target population in the most integrated setting. In the event of any dispute over the language or construction of this agreement, its requirements, or its congruence with the requirements of the law, the Parties agree to meet and confer in an effort to achieve a mutually agreeable resolution. If after meeting and conferring, the Parties fail to agree, the Parties may submit the matter to the District Court for a determination and opinion as to the language or construction of this agreement.

G. A party may seek relief from the terms of this agreement by establishing that a significant change in facts or law warrants revision of the agreement and that the proposed modification is suitably tailored to the changed factual or legal circumstances. In the event that a party seeks such relief, it is hereby agreed that Fed. R. Civ. P. 60(b)(4-6) provides legally appropriate bases for such relief.

H. Nothing in this agreement is intended to require the State to force services required by this agreement upon individuals within the target population or override their right to make choices, including their right to refuse treatment or services consistent with state and federal law. For this reason, the Parties agree that the State's level of compliance with the terms of this Settlement Agreement shall not be affected by the refusal of any individual to accept or utilize any of the services set forth herein.

I. The Parties intend to allow the State to leverage the funding of the services listed herein to the fullest extent permitted by available federal, State, and private funding. Nothing in this Settlement Agreement shall preclude the State from seeking authority from the Center for Medicare and Medicaid Services at the United States Department of Health and Human Services for approval of coverage of Medicaid services under a different name than that used in this Settlement Agreement provided the State can demonstrate that the coverage for such services is otherwise legally permitted. In the event that the definitions and terms used in this Settlement Agreement create any difficulty in the State's utilization of funding from any federal, State, or private source, the Parties agree to work collaboratively to maximize the State's ability to access such funding.

J. This Settlement Agreement shall constitute the entire integrated Settlement Agreement of the Parties.

K. Any modification of this Settlement Agreement shall be executed in writing by the Parties, shall be filed with the Court, and shall not be effective until the Court enters the modified agreement and retains jurisdiction to enforce it.

L. The Settlement Agreement shall be applicable to, and binding upon, all Parties, their employees, assigns, and their successors in office. If the State contracts with an outside provider for any of the services provided in Sections II-V of this agreement, the agreement shall be binding on any contracted parties, including agents and assigns.

M. The State shall ensure that all appropriate State agencies take any actions necessary for the State to comply with provisions of this Settlement Agreement.

N. By entering into this Settlement Agreement, the State does not admit the truth or validity of any claim made against them by the United States. The State parties also do not speak for the Delaware General Assembly, which has the power under the Delaware Constitution and laws to determine the appropriations for, and to

27

amend the laws respecting, the State of Delaware's programs for mental health. However, the State parties acting under their existing authority agree that it will be a condition of their conduct of the programs covered by this agreement to comply with the Settlement Agreement.

O. If the State fails to attain necessary appropriations to comply with this Settlement Agreement, the United States has the right to withdraw its consent to this agreement and revive any claims otherwise barred by operation of this Settlement Agreement.

P. The United States and the State shall bear the cost of their fees and expenses incurred in connection with this case.

## VIII.   General Provisions

A. The Settlement Agreement is binding on all successors, assignees, employees, agents, contractors, and all others working for or on behalf of the State to implement the terms of this Settlement Agreement.

B. The State agrees that it shall not retaliate against any person because that person has filed or may file a complaint, provided assistance or information, or participated in any other manner in the United States' investigation or the Monitor's activities related to this agreement. The State agrees that it shall timely and thoroughly investigate any allegations of retaliation in violation of this agreement and take any necessary corrective actions identified through such investigations.

C. If an unforeseen circumstance occurs that causes a failure to timely fulfill any requirements of this agreement, the State shall notify the United States and the Monitor in writing within 20 calendar days after the State becomes aware of the unforeseen circumstance and its impact on the State's ability to perform under the agreement. The notice shall describe the cause of the failure to perform and the measures taken to prevent or minimize the failure. The State shall take all reasonable measures to avoid or minimize any such failure.

D. Failure by any Party to enforce this entire agreement or any provision thereof with respect to any deadline or any other provision herein shall not be construed as a waiver, including of its right to enforce other deadlines and provisions of this agreement.

E. The Parties shall promptly notify each other of any court or administrative challenge to this agreement or any portion thereof, and shall defend against any challenge to the agreement.

F.  The Parties represent and acknowledge this Settlement Agreement is the result of extensive, thorough and good faith negotiations. The Parties further represent and acknowledge that the terms of this Settlement Agreement have been voluntarily accepted, after consultation with counsel, for the purpose of making a full and final compromise and settlement of any and all claims and for the express purpose of precluding any further or additional claims arising out of the allegations set forth in the complaints and pleadings in these Actions. Each Party to this Settlement Agreement represents and warrants that the person who has signed this Settlement Agreement on behalf of his or her entity is duly authorized to enter into this Settlement Agreement and to bind that Party to the terms and conditions of this Settlement Agreement.

G.  Nothing in this Settlement Agreement shall be construed as an acknowledgement, an admission, or evidence of liability of the State under the Constitution of the United States, federal or state law, and this agreement may not be used as evidence of liability in this or any other civil or criminal proceeding.

H.  This Settlement Agreement may be executed in counterparts, each of which shall be deemed an original, and the counterparts shall together constitute one and the same agreement, notwithstanding that each party is not a signatory to the original or the same counterpart.

## IX.  Implementation of the Agreement

A.  The implementation of this Settlement Agreement shall begin immediately upon the Effective Date, which shall be the date on which this Settlement Agreement is approved and entered as an order of the Court.

B.  Within one month from the effective Date of this Settlement Agreement, the State shall appoint a Settlement Agreement Coordinator to oversee compliance with this Settlement Agreement and to serve as a point of contact for the United States and the Monitor.

C.  The State shall maintain sufficient records to document that the requirements of this Settlement Agreement are being properly implemented and shall make such records available to the Monitor and the United States for inspection and copying on a reasonable basis. Such action is not intended, and shall not be construed, as a waiver, in litigation with third parties, of any applicable statutory or common law privilege associated with such information. Other than to carry out the express functions as set forth herein, both the United States and the Monitor shall hold such information in strict confidence to the greatest extent permitted by any applicable law or regulation.

D.  The State shall work collaboratively with the Monitor, and, where appropriate, with the United States, in developing its implementation plans.  In order to determine compliance with this Settlement Agreement, and to the extent they are

within the State's custody or control, the Monitor and the United States shall have full access to persons, employees, residences, facilities, buildings, programs, services, documents, records, and materials that are necessary to assess the State's compliance and/or implementation efforts with this Settlement Agreement. Such access shall include departmental and/or individual medical and other records. The Monitor and the United States shall provide reasonable notice of any visit or inspection. The Parties agree in cases where there is an emergency situation that presents an immediate threat to life, health or safety of individuals, neither the United States nor the Monitor will be required to provide the State notice of such visit or inspection. Such access shall continue until this case is dismissed. Such access as set forth herein is not intended, and shall not be construed, as a waiver, in litigation with third parties, of any applicable statutory or common law privilege associated with such information. Other than to carry out the express functions as set forth herein, both the United States and the Monitor shall hold such information in strict confidence to the greatest extent permitted by any applicable law or regulation.

X.    "Notice" under this agreement shall be provided by overnight courier to the following or their successors:

Chief of the Special Litigation Section
United States Department of Justice
Civil Rights Division
601 D St., NW
Washington, D.C. 20004

Attorney General
Delaware Department of Justice
New Castle County
820 North French St.
Wilmington, DE 19801

Secretary of DHSS
1901 North DuPont Highway
Administration Building, 1st Floor
New Castle, DE  19720

FOR THE UNITED STATES:

THOMAS E. PEREZ
Assistant Attorney General
Civil Rights Division

SAMUEL R. BAGENSTOS
Principal Deputy Assistant Attorney General
Civil Rights Division

JONATHAN SMITH
Chief
Special Litigation Section

JUDY C. PRESTON
Deputy Chief
Special Litigation Section

ALISON N. BARKOFF
Special Counsel for Olmstead Enforcement
Civil Rights Division

DAVID DEUTSCH
DEENA FOX
Senior Trial Attorneys
U.S. Department of Justice
Civil Rights Division
Special Litigation Section

31

FOR THE STATE OF DELAWARE:

RITA M. LANDGRAF
Secretary
Delaware Department of Health and Social Services

LAWRENCE W. LEWIS
Delaware State Solicitor

/S/ Ilona Kirshon

ILONA KIRSHON
Deputy Attorney General

AARON R. GOLDSTEIN
Deputy Attorney General

/S/ Ralph K. Durstein

RALPH K. DURSTEIN
Deputy Attorney General

SO ORDERED this 15th day of July 2011

UNITED STATES DISTRICT JUDGE